In re CADENCE DESIGN SYSTEMS, INC. SECURITIES LITIGATION.

This Order Relates to: Case Nos. 08–4966 SC, 08–5027 SC, and 08–5273 SC.

Case No. 08–4966 SC.

United States District Court, N.D. California.

March 2, 2010.

---

Karen T. Rogers, Jeff S. Westerman, Milberg LLP, Los Angeles, CA, Jeffrey A. Berens, Robert J. Dyer, III, Dyer & Berens LLP, Denver, CO, for Changhui Hu.

Lionel Z. Glancy, Michael M. Goldberg, Peter Arthur Binkow, Glancy & Binkow LLP, Los Angeles, CA, for Deepak Vyas.

Darren Jay Robbins, Catherine J. Kowalewski, Matthew Paul Montgomery, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, for David Collins.

Shawn A. Williams, Shirley H. Huang, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, for David Collins, Alaska Electrical Pension Fund.

Ethan D. Dettmer, Matthew Stewart Kahn, Gibson, Dunn & Crutcher LLP, San Francisco, CA, Sally J. Berens, Gibson, Dunn & Crutcher LLP, Palo Alto, CA, for Cadence Design Systems, Inc., Michael J. Fister, William Porter, Kevin S. Palatnik, John B. Shoven, Kevin Bushby.

Blair Allen Nicholas, Bernstein Litowitz Berger & Grossmann, San Diego, CA, for Anchorage Police and Fire Retirement System.

*ORDER DENYING MOTION TO DISMISS*

SAMUEL CONTI, District Judge.

## I. *INTRODUCTION*

Now before the Court is a Motion to Dismiss the First Amended Complaint, filed by Defendant Cadence Design Systems, Inc. ("Cadence"), as well as Cadence's former CEO, Michael J. Fister ("Fister"), Senior Vice President and CFO Kevin Palatnik ("Palatnik"), former Executive Vice President and CAO William Porter ("Porter"), and former Executive Vice President of Worldwide Field Operations, Kevin Bushby ("Bushby;" collectively with other individuals, "Individual Defendants," and with Cadence, "Defendants"). Docket No. 57 ("Motion"). Plaintiffs, including lead plaintiff Alaska Electrical Pension Fund, submitted the First Amended Complaint after this Court granted Defendants' prior motion to dismiss the Consolidated Amended Complaint. Docket Nos. 53 ("FAC"), 48 ("MTD Order"), 39 ("CAC"). The Motion is fully briefed. Docket Nos. 62 ("Opp'n"), 65 ("Reply").

Having considered all of the papers submitted, the Court concludes that this matter is appropriate for decision without oral argument. The Court is satisfied that the additional allegations and details pled by the FAC are now sufficient to meet the requirements set out in the Public Securities Litigation Reform Act ("PSLRA"). The Motion is therefore DENIED.

## II. *BACKGROUND*

The Court has previously set out the factual background for this suit, as well as the legal standards for pleading claims under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), in light of the PSLRA. MTD Order at 2–15. Plaintiffs allege that Defendants made a number of misstatements related to Cadence's earnings in the first and second quarters of 2008 ("1Q" and "2Q," respectively). Statements of Cadence's earning for these periods were false because Cadence had improperly accounted for two major transactions, one in 1Q and one in 2Q (the "1Q agreement" and

the "2Q agreement"). After an accounting investigation in late 2008, Cadence acknowledged that its earnings statements were greatly overstated, and it issued restatements to correct its earlier false representations.

It is helpful to recount the structure of Cadence's business dealings, as well as the proper accounting treatment for those transactions. When licensing its electronic design automation technology to its customers, Cadence enters into two relevant types of licenses: term licenses and subscription licenses. As described in Cadence's 10–K for the fiscal year of 2007, a term license allows Cadence's customers to "[a]ccess and use all software products delivered at the outset of an arrangement throughout the entire term of the arrangement, generally [for] two to four years, with no rights to return." Appendix to FAC, Docket No. 54, Ex. 6 ("2007 10–K") at 30. In other words, a term license typically allows a customer to use a defined set of already available software. Subscription licenses, on the other hand, are more open ended, and allow "access and use [of] all software products delivered at the outset of an arrangement," and the additional right to "[u]se unspecified additional software products that become commercially available during the term of the arrangement." *Id.* The accounting treatment for term and subscription licenses differs dramatically in terms of when revenue is supposed to be recognized, according to both Generally Accepted Accounting Principles ("GAAP") and Cadence's internal accounting policies (which purport to follow GAAP). *Id.* at 29–30. For a term license, revenue "is recognized upon the later of the effective date of the arrangement or delivery of the software product." *Id.* at 30. That is, a term license may give Cadence the ability to recognize revenue from the license immediately. Revenue from a subscription license, on the other

hand, must be recognized ratably over the entire term of the license. *Id.*

Initially, Cadence improperly classified both the 1Q and the 2Q agreements as term agreements, and recognized all of the revenue from these transactions up front instead of ratably. *See generally* Appendix to FAC Ex. 39 ("Dec. 10 Press Release"). Both of these agreements should have been classified as subscription agreements, and Cadence should not have immediately recognized the revenue. *Id.*

The FAC provides a bit more detail than the CAC about the 1Q agreement. The FAC confirms that the client involved in the 1Q agreement was Fujitsu. *See* FAC ¶¶ 16, 74. As this Court previously noted, the crucial detail that rendered Cadence's initial accounting treatment of this agreement improper was the fact that the agreement was negotiated "in contemplation" of a later subscription agreement (the "3Q agreement"), and included or contemplated the right to as-of-yet unreleased software. MTD Order at 16. These factors indicate a subscription license, rather than a term license. Cadence recounted in its press release following its accounting investigation in late 2008:

> [T]he term license arrangement executed during the first quarter and the subscription license arrangement executed during the third quarter collectively represented a multiple element arrangement. Because the subscription arrangement provides the customer with the right to use unspecified additional software products that become commercially available during the term of the arrangement, Cadence determined that the revenue relating to this multiple element arrangement should be recognized during the term of the arrangement, beginning in the fourth quarter of 2008.

Dec. 10 Press Release at 10. Because of the improper accounting, Cadence recog-

nized $24.8 million in up-front revenue, making the 1Q agreement the largest single transaction of that quarter. FAC ¶ 16.

The FAC identifies Nvidia as the client involved in the 2Q agreement. FAC ¶¶ 18, 110. The 2Q agreement involved the simultaneous cancellation of a subscription license and the execution of a term license arrangement. *See* Dec. 10 Press Release at 11. Cadence later:

> determined that, despite the cancellation of the subscription arrangement, the customer did not intend to substantively cancel its right to access future new technology because at the time the subscription license was cancelled the customer intended to reestablish its right to access future new technology at a later time. Accordingly, . . . $12.0 million of revenue originally recognized in the second quarter of 2008 relating to the term license and hardware arrangement should be recognized ratably over the term of the arrangement, consistent with the way in which revenue was recognized on the cancelled subscription arrangement.

*Id.* The crucial detail that rendered Cadence's initial accounting treatment of this agreement erroneous was the fact that Nvidia intended to retain certain rights to use future technology, which Nvidia had enjoyed under the subscription license that it simultaneously cancelled. *See* MTD Order at 16.

This Court decided the previous motion to dismiss in Defendants' favor, finding that Plaintiffs had failed to properly allege scienter on the part of the Individual Defendants or any other Cadence officer. Although Plaintiffs effectively alleged that Defendants had both the motive and the opportunity to commit fraud, there were no allegations that strongly supported an inference that any Defendant was sufficiently familiar with the details of the 1Q or 2Q agreements, such that they could recognize that Cadence's accounting treatment of these agreements was incorrect. *Id.* at 25–26. The Court concluded that none of the pled facts supported an inference that could "bridge the gap" between the key details of the agreements and the Individual Defendants. *Id.* Below, the Court discusses the key allegations, as newly pled or recontextualized by the FAC, that sufficiently narrow the gap and create a strong inference of scienter.

## III. DISCUSSION

■ This Court previously examined the majority of facts alleged in the FAC, on an individual basis, when it examined the CAC in its previous Order. No single new allegation in the FAC constitutes a "smoking gun" that, taken alone, supports a strong inference of scienter. However, Plaintiffs need not produce a "smoking gun" to meet their burden. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). They must plead facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324, 127 S.Ct. 2499. Below, the Court recounts key specific facts alleged by the FAC, and the inferences regarding the Individual Defendants' scienter that can be drawn from these new allegations. The Court recounts only those particular allegations that, when considered together, can convincingly contribute to the conclusion that the inference of fraud or reckless conduct is at least as likely as the inference of negligence or innocent mistake.

### A. Bushby Played a Role in the 1Q and 2Q Agreements

The first factor that contributes to the Court's finding that Plaintiffs have met their burden is the presence of new allega-

tions that tie executive management more closely to the 1Q and 2Q agreements. In the CAC, which the Court previously examined, Plaintiffs had generally pled that certain Individual Defendants were involved in negotiating unspecified contracts with clients, but the CAC was bereft of any concrete indication that anyone besides Cadence's "sales personnel" were involved specifically in the 1Q or 2Q agreements. *See* CAC ¶ 59(c). Based on the CAC, it appeared quite possible that involvement by executive officers was filtered through a long chain of mid-level reviewers. Any inference that Individual Defendants were familiar enough with the details of the 1Q and 2Q agreements to recognize the accounting errors would have been mere speculation. *See* MTD Order at 20 n. 9. Now, the FAC ties Bushby—one of Cadence's executive officers— directly to the 2Q agreement, and additional allegations suggest that Bushby was likely involved in the 1Q agreement as well.

■ Plaintiffs have added the detailed allegations of eight additional confidential witnesses ("CW") to the FAC. In order to establish scienter through the accounts of confidential witnesses, "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir.2009). To determine whether the witnesses "would possess the information alleged," courts must consider "the level of detail provided by the confidential sources, the corroborative

nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* at 995 (citation and internal quotation marks omitted).

■ CW15 confirms that the 2Q agreement involved Nvidia, and he[1] describes the structure and incentives of the Nvidia agreement in considerable detail. *See* FAC ¶¶ 74(b), 110. CW15 states that "Bushby specifically gave instructions to VP of Sales Mike Ellow who communicated Bushby's instructions to Chris Cronk and Neil Zaman, the Account Executives who handled the Nvidia account, to restructure the transaction with Nvidia that was already in place because Cadence needed to 'count this deal as revenue' in that quarter." *Id.* ¶ 110. He also claims that the initial agreement, which Cadence sought to renegotiate, involved a 5–year multi-element transaction, that Nvidia had paid $9 million up front for hardware that Cadence was obliged to update, and that Cadence returned this $9 million as part of the renegotiations. *Id.* Plaintiffs claim that CW15 is "a former Sales Director for North America," who worked under Bushby but reported directly to Thomas Cooley. *Id.* ¶ 51(*o* ). As a sales director, it is plausible that he had personal knowledge of this information. The level of detail provided by his statement lends his account a significant amount of credibility. *See Zucco Partners,* 552 F.3d at 995. That Bushby would be involved in the transaction is already plausible in its own right. The 2Q agreement was very large, worth around $12 million, and one of the larger transactions during the 2Q08 period. *See* FAC ¶ 18. CW15 also reports that he attended a meeting of the entire

1. For the sake of simplicity, the Court will use "he" when referring to all confidential witnesses.

sales force in January of 2008, where Fister stated that he and Bushby were "involved" in "every contract over $5 million." *Id.* ¶ 51(*o* ). The Court finds that the level of detail provided by CW15, coupled with the coherence and plausibility of the allegations, provide an adequate basis for reliability at this stage of the litigation. *C.f. Zucco Partners,* 552 F.3d at 995. CW15's statements nudge Plaintiffs' allegations as to Bushby's involvement beyond the realm of mere speculation.

■ The FAC's allegations with respect to Bushby's involvement in the 1Q agreement are significantly less direct. The 1Q agreement—worth roughly $24.8 million—was the largest transaction of the quarter and represented over 10% of the company's reported revenue for that quarter. FAC ¶ 16. This makes it plausible that the company's top management was involved at some level of the negotiations, particularly in light of the fact that Fister had represented that he and Bushby were involved in all transactions of such size. *Id.* ¶ 51(*o* ). Although this alone may be insufficient to conclude that the Individual Defendants were closely involved, Plaintiffs offer one additional bit of corroborative evidence, to which this Court extends limited consideration. CW12 claims that Bushby "negotiated the 1Q08 Fujitsu deal, was 'told to do it' by Fister and was fired because of the event that gave rise to the restatement." *Id.* ¶ 75.

The credibility of CW12 is problematic. The FAC does not suggest that CW12 was ever a Cadence employee—rather, he was a consultant who focused on Cadence's industry and counseled Cadence's clients. *See* FAC ¶ 51(*l* ). His account is therefore most likely hearsay—at least some of his information was gleaned from discussions with a Fujitsu engineer. *Id.* ¶ 75(g). Although confidential witnesses who claim "personal knowledge" of a fact are preferable, this is not a hard-and-fast requirement: "[T]he fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus. However, a hearsay statement … may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration...." *Zucco Partners,* 552 F.3d at 997 n. 4. The Court finds that CW12's account is worth noting—that is to say, it should not be entirely discounted. As an established industry consultant,[2] CW12's livelihood depends upon his access to reliable, specific industry information, and his role as a consultant to Cadence's clients could plausibly give him access to information about Cadence's business dealings. Bushby's involvement would have been clear to anyone else working on the transaction; it is a fact that an industry consultant could have credibly learned in the regular course of his business without relying on multiple layers of hearsay.[3] When taken in light of the other evidence related to the scope of the deal, and Fister's statement that he or Bushby would

---

**2.** Following the submission of Defendants' Reply, Plaintiffs sought to submit an additional declaration, under seal, that establishes CW12's identity and his standing as a consultant in the electronic design automation industry. Docket No. 66. Defendants submitted an Opposition. Docket No. 69. This Court GRANTS Plaintiffs' request to submit this declaration under seal. The Court is persuaded that the declaration's contents, read in light of the FAC, suggest that CW12

had access to reliable information about Cadence's activities. CW12's position as a consultant to Cadence's customers significantly strengthens this inference.

**3.** Notably, this Court finds the contention that Bushby "was 'told to do it' by Fister," or that Bushby and Fister were fired because of the transaction, to be significantly less credible. It does not rely upon these claims.

be involved in any transaction of this size, CW12's statements are sufficiently plausible and coherent to support an inference that Bushby was involved at some level in the 1Q agreement.

■ Having established that Bushby was likely involved in the 1Q and 2Q agreements, and the negotiations that led up to them, the next question is whether Bushby's involvement in the transactions is indicative of scienter. The Court finds that it is. CW8, an Account Executive for the U.S. and North America during the relevant time period, describes the general role that Bushby typically played in contract negotiations. FAC ¶¶ 51(h), 75(a). As an Account Executive, he would presumably be familiar with Bushby's general role in negotiating deals with large clients. CW8 downplays the role of the lower sales personnel, stating that they typically "acted more like liaisons with customers ... simply determining what products the customer needed and when they needed it or would buy them.... [T]he negotiation of terms and 'architecting' all other financial aspects of the deals, especially large deals, was not done by the Sales persons but was done by the 'big guns.'" *Id.* ¶ 75(b). Although the term "big guns" is regrettably vague, CW8 does state that "Bushby in particular ... would instruct the Sales people how to structure the Sales agreements, monitor the deal progress until it was finalized, and at which point, give approval to draw up the Sales contract." *Id.* ¶ 75(a). CW8's account is corroborated by that of CW14, a former Account Manager, who stated that "Bushby was intimately involved in the review of sales including the details of sales in any given quarter," and "specifically inquired as to how much each customer was going to pay upfront and how much would be paid ratably." *Id.* ¶ 78(h). Although these statements remain general in nature, they do detract from the likelihood that Bushby's role in such large agreements was limited or remote, and therefore strengthen the inference of scienter.

The FAC now gives rise to a strong inference that Bushby was involved in the 1Q and 2Q agreements. Plaintiffs needn't prove that Bushby was involved in the face-to-face negotiations between Cadence and its clients—given the Court's findings in the next section, they need only show that he was directly involved in some level of the agreements' formation. His involvement frees Plaintiffs from the burden of establishing that the key details of these transactions had to percolate up to the executive officers through less direct or reliable channels of communication. While this does not necessarily give rise to a strong inference of scienter, it significantly reduces the possibility that the misstatements "were the result of merely careless mistakes at the on false information fed it from below ...." *See Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 709 (7th Cir.2008).

**B.** ***The Accounting Treatment of the 1Q and 2Q Agreements was the Fundamental to the Purpose of These Agreements***

■ The FAC puts more emphasis than did the CAC on Cadence's practice of renegotiating existing subscription contracts in order to realize greatly increased short-term revenue. More importantly, the FAC does a much better job of specifically tying the 1Q and 2Q agreements to this practice. The CAC generally alleged that by 2008, Cadence had begun to emphasize term contracts over subscription contracts, so as to "pull future revenue forward to meet the Street's expectations." *See* CAC ¶¶ 6, 60, 60(c)-(d). The Court concluded that this did little more than create a precarious financial situation for Cadence, which provided a motive for Defendants to cook their books. In the FAC, Plaintiffs allege more facts to suggest that the 1Q and 2Q agreements were specific instances

of the general practice of renegotiating subscription agreements into term agreements, in order to engorge short-term revenue at the expense of long-term profit.

In general, Plaintiffs' allegations regarding Cadence's renegotiation practices are more complete and better supported than those in the CAC. CW12 claims to have personal knowledge of this practice, as an outside consultant, because he advised specific Cadence customers who had been approached by Cadence to renegotiate their subscription licenses into term licenses. FAC ¶ 75(h). CW9 and CW10, a Group Marketing Director and an Operations Director, report that Cadence's management was consistently pressuring its sales force to renew customer contracts, as term agreements, before they expired. *Id.* ¶ 78(b), (e). CW14, a former Account Manager, states that "the Sales force was instructed by senior management and specifically Bushby to call on customers to let them renew their contracts early. According to CW14, huge discounts were provided to customers in order to get them to renew early and even more discounts were provided if customers paid cash upfront instead of making payments over the life of the contract." *Id.* ¶ 78(f). This "would essentially convert a Subscription contract to a Term contract to allow for upfront revenue recognition." *Id.* This was apparently a practice that was driven by Cadence's top executives.

In particular, the FAC now makes a credible argument that the 1Q and 2Q agreements were themselves manifestations of this practice. Cadence appears to have entered into negotiations regarding the 2Q agreement specifically to realize revenue from Cadence's relationship with Nvidia sooner rather than later. CW15

reported that Bushby gave Mike Ellow specific instructions "to re-structure the transaction with Nvidia that was already in place because Cadence needed to 'count this deal as revenue' in" 2Q08. FAC ¶ 110.[4] These directions are in line with Cadence's apparent sales policies during this period. Notably, when Cadence later moved away from its term-agreement model in 3Q of 2008, Palatnik indicated, on several occasions, the degree to which the sales force was restricted by the company's push for term licenses, by stating that Cadence was "releasing the handcuffs on our channel," and "unlock[ing] our salesforce" by letting them negotiate freely, without creating an artificial separation between term and subscription licenses. *See* Appendix to FAC, Ex. 25 ("Aug. 7, 2008 Conf. Call Tr.") at 5; *Id.* Ex. 29 ("Sept. 3, 2008 Conf. Call Tr.") at 4. Between CW15's statements and Cadence's own characterization of its sales policies during 2Q, the Court may infer that the 2Q agreement was not freely negotiated by Cadence's salespeople and improperly classified after the fact; instead, the allegations suggest that Cadence negotiated with an eye towards structuring the license so that Cadence could walk away with something classifiable as a term license.

The FAC does not include any allegations that directly indicate that the 1Q agreement was negotiated for the purpose of structuring a term agreement. However, because the 1Q agreement was negotiated in contemplation of the 3Q agreement (which was properly treated as a subscription license), it is eminently plausible that in negotiating the 1Q agreement, Cadence sought to pull out the term-related aspects of the transaction in order to realize immediate revenue.[5] The Court finds it possi-

---

4. It is not clear whether statements made by CW5 corroborate this account or not—the Court suspects that certain allegations attrib-

uted to CW5 in the FAC are the result of a typo. *See* FAC ¶ 29.

5. During the conference calls noted in the

ble to draw an inference that Cadence engaged in negotiations with Fujitsu and Nvidia for the purpose of entering into term agreements.

The Court may presume that there would be nothing wrong with renegotiating an agreement in order to alter its accounting treatment, so long as the form and substance of the agreement is successfully renegotiated. If this was the purpose of the 1Q and 2Q agreement negotiations, this is not, in and of itself, indicative of fraud. Nevertheless, this purpose does shed a new light on the agreements, and affects this Court's expectations as to what details would have been most important, and necessarily apparent, to any individual who worked on the transactions at any level. If Cadence employees approached Fujitsu for the specific purpose of changing a subscription agreement into a term agreement, or negotiated with the priority of separating term and subscription components, then Fujitsu's desire to retain access to future technology must have been at the very heart of these negotiations, and not an ancillary detail. It is difficult to imagine a scenario in which Fujitsu's intentions would not have been communicated to everyone involved—including, most likely, to Bushby.[6] Similarly, if Cadence approached Nvidia specifically to cancel a subscription agreement and replace it with a term agreement that allowed Cadence to realize the revenue immediately, then everyone involved must have been aware of (or deliberately reckless regarding) any intention by Nvidia to retain rights under its prior subscription agreement. Perhaps Bushby believed that sufficient protections or separation had been put into place to allow the licenses to be classified as term licenses; however, given the size of these transactions, and the importance of having these transactions treated as sought-after term licenses, the Court finds that it is at least as likely as not that the misclassifications were the result of, at a minimum, a reckless disregard.

## C. *Scienter of Individual Defendants*

The Court has concluded that Bushby was, more likely than not, involved at some level in the formation of the 1Q and 2Q agreements. The Court has further concluded that in negotiating these agreements, it was a priority—and perhaps the primary purpose of the negotiations—that the licenses be structured so as to allow Cadence to recognize the revenue from the agreements immediately. From this, the Court concludes that it would be plausible to infer that Bushby was at least deliberately reckless regarding the term nature of the transactions. The competing inference, that he worked on these deals and innocently missed the most important details, is less plausible. There is therefore a strong inference that Bushby knew or should have known that the 1Q and 2Q

previous paragraph, Palatnik described Cadence's practices of "separating discussion between a term license and a subscription license for some period of time. Going back a year, 18 months. It used to be 30-day separation, then it went to 45 days, then it went to one quarter, and then it actually went to two-quarter separation. Otherwise, in substance, what the accountants would argue is that [it] is a ratable arrangement." Sept. 3, 2008 Conf. Call Tr. at 4. This practice of "separating" suggests that Cadence's personnel knew of the accounting consequences of their discussion, and were taking special measures to secure term licenses from customers who also were interested in subscription licenses.

**6.** Indeed, given that Cadence's restatement specifically stated that the two agreements were negotiated "in contemplation of one another," it is extremely unlikely that the negotiating parties, and anyone to whom they reported, would not have known these details. *See* Dec. 10 Press Release at 10.

agreements were, in substance, subscription agreements at the time that the false statements regarding Cadence's inflated earnings were made by the other Individual Defendants.[7] This is sufficient to establish scienter as to Bushby under the PSLRA.

 As Defendants point out, Mot. at 10 n. 8, the FAC does not claim that Bushby personally made any of the alleged misstatements, nor that he prepared any of the statements that were ultimately incorporated into the documents signed by the other Individual Defendants.[8] These statements were made by the other Individual Defendants. Generally, "the PSLRA requires [plaintiffs] to plead scienter with respect to those individuals who actually made the false statements ...," and Plaintiffs must therefore plead " 'facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct' on the part of" the Individual Defendants who made the false statements. *Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736, 745 (9th Cir.2008) (quoting *In re Silicon Graphics,* 183 F.3d 970, 974 (9th Cir.1999)). The Court finds that Plaintiffs have met this burden.

Bushby was one of only five of Cadence's executive officers, and these deals were among the largest deals of their respective quarters. The deals were not routine sales calls, which happened to be classified as term licenses as an afterthought-rather, Cadence most likely approached Fujitsu and Nvidia for the specific purpose of acquiring term, and not subscription, licenses. The accounting mistreatment of these deals made the difference between missing and meeting Cadence's projections for each quarter. It is possible that Bushby kept his knowledge or apprehension of the transactions to himself. However, this is no more likely than the competing inference: that Bushby informed at least some of the other Individual Defendants of the facts that rendered the accounting treatment of the 1Q and 2Q agreements incorrect. Given the nature and context of these transactions, the inference that Bushby knew or was reckless regarding the nature of the agreements is incompatible with an inference that the other Individual Defendants lacked scienter. Under these peculiar facts, having penetrated the Defendants' executive circle, so to speak, Plaintiffs may

---

7. In making this inference, the Court specifically notes that the accounting practices at issue were by no means obscure to the executives who were involved in the sales or operations-oriented aspects of the business—rather, the accounting distinctions allegedly guided, and even formed the backbone of, Cadence's business model during this period (i.e., the prioritization of term over subscription licenses).

8. Defendants also request that the Court dismiss Bushby from this suit on this basis. Mot. at 10 n. 8. However, Plaintiffs have created a strong inference that Bushby was closely involved in deals that were wrongly classified by Cadence's accountants, and that he was either knowledgeable or reckless with regard to this misclassification. He surely knew of the importance of the proper classification for these transactions, and he probably

had control over the information that was passed along to those within Cadence who were responsible for classifying the transactions. The Court therefore finds that this is sufficient to infer, at this stage, that Bushby substantially participated in the alleged misstatements. *C.f. Cooper v. Pickett,* 137 F.3d 616, 625 (9th Cir.1997) (finding that plaintiff could plead violation of Section 10(b) against defendant who passed misinformation to analysts who then released false reports); *see also SEC v. Fraser,* No. 09–443, 2010 U.S. Dist. LEXIS 7038, *13–15 (D.Ariz. Jan. 28, 2010) (not for publication) ("When a corporate officer instructs a company accountant to book fraudulent transactions, with knowledge that those false transactions will be incorporated into the company's financial statements, it can fairly be said that the officer substantially participated in the 'creation, drafting, editing, or making' of the false statements.").

support an inference that the other executive officers were aware of certain key facts about certain key deals—because these facts were almost certainly known to Bushby, as was their import.

In reaching this conclusion, the Court does not rely upon the group pleading doctrine, which has been rejected by a majority of district courts in this circuit and this district. *See, e.g., In re Tibco Software Secs. Litig.,* No. 05–2146, 2006 WL 1469654, \*27, 2006 U.S. Dist. LEXIS 36666, \*82 (N.D.Cal. May 25, 2006) ("[C]ourts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA."). The inference of scienter against the other Individual Defendants—namely, Fister, Palatnik, and Porter—does not arise from any presumption or theory of collective action or collective knowledge. Rather, it arises because of the likelihood that Bushby would have told other executive officers that these important deals involved factors that rendered their classification as term licenses highly questionable.[9] Having weighed the competing inferences, and when considered in light of the various individual factors discussed in this Court's previous Order, the Court concludes that it is at least as likely as not that the other Individual Defendants were aware of, or deliberately reckless, regarding the facts that rendered the 1Q and 2Q agreements subscription licenses, rather than term licenses. Plaintiffs have therefore met their burden to support a strong inference that Defendants were at least reckless with regard to the nature of the 1Q and 2Q agreements, and their statements regarding Cadence's earnings during 1Q and 2Q of 2008.[10]

### D. *Plaintiffs' Section 20(a) Claim*

■■■ To plead a prima facie case under Section 20(a) of the Securities Exchange Act, Plaintiffs must show: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). Defendants first argue that Plaintiffs' Section 20(a) claim must fail because Plaintiffs' underlying claim fails. Mot. at 25. The Court declines to dismiss Plaintiffs' Section 20(a) claim on this basis because it concludes that Plaintiffs have successfully stated an underlying claim.

■■■ Defendants also argue, quite succinctly, that "under Section 20(a), Plaintiffs must allege Defendants were 'control persons' with reference to the fraudulent conduct alleged in the primary violation. But

---

9. The Court further notes that, given the size and purpose of the deals, the inference that the various Individual Defendants knew of the transactions would be, at least, more than speculative even absent Plaintiffs' allegations regarding Bushby's direct involvement.

10. Defendants requested judicial notice, Docket No. 60 ("RJN"), of ten documents attached to a declaration submitted by Sarah A. Brown, counsel for Defendants, Docket No. 59. Because Defendants' Motion focuses exclusively on scienter, the Court DENIES Defendants' request for judicial notice as to Cadence's stock prices over the relevant period. As this Court stated in its previous Order, it does not find this information to illuminate the questions of scienter in this case. *See*

MTD Order at 26 n. 10. The Court also DENIES Defendants' request for judicial notice of excerpts from nine 10–Q reports because it finds this information unnecessary. These documents were submitted to refute Plaintiffs' allegations that Cadence had added the qualifier "sufficiently" in its public representations, that its "disclosure controls and procedures were sufficiently effective." FAC ¶ 67; RJN at 2–3. Plaintiffs hoped that the use of this additional word may be indicative of fraud. Even assuming that Cadence made this change in its disclosures, the Court is not persuaded that this change adds any weight whatsoever to an inference of fraud. Consequently, the documents that Defendants have submitted to refute this point are unnecessary.

Plaintiffs' 'control' allegations are generalized, conclusory, and unsupported by factual allegations. Such 'boilerplate' allegations are insufficient to state a claim." *Id.* (quoting *In re Downey Sec. Litig.*, 2009 WL 736802, *15–16, 2009 U.S. Dist. LEXIS 25007, *44–46 (C.D. Cal. Mar. 18, 2009)).

" 'Control' is defined in the regulations as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person....'" *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.2003) (quoting 17 C.F.R. § 230.405). "In order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power...." *Howard*, 228 F.3d at 1065. Much of the FAC is directed at describing, with support from confidential witnesses, the Individual Defendants' roles within Cadence, in order to support the inference that they possessed the proper scienter as to the 1Q and 2Q agreements. While many of these generalized descriptions do not go a long way, in and of themselves, towards establishing the requisite scienter, they do strongly show that Defendants performed review, control, or accounting functions related to the relevant transactions that were misstated, and the process by which these transactions were recognized for accounting purposes. The Court concludes that Plaintiffs have met their burden to state a claim under Section 20(a).

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is DENIED.

IT IS SO ORDERED.