**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In Re: VERIFONE HOLDINGS, INC.
SECURITIES LITIGATION,

NATIONAL ELEVATOR INDUSTRY
PENSION FUND, Lead plaintiff on
behalf of itself and all others
similarly situated,
            *Plaintiff-Appellant*,

v.

VERIFONE HOLDINGS, INC.;
DOUGLAS G. BERGERON; BARRY
ZWARENSTEIN,
            *Defendants-Appellees*.

No. 11-15860

D.C. No.
3:07-cv-06140-
MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
May 17, 2012—San Francisco, California

Filed December 21, 2012

Before: Sidney R. Thomas, M. Margaret McKeown,
and William A. Fletcher, Circuit Judges.

Opinion by Judge McKeown

**SUMMARY**[*]

**Securities Fraud**

The panel reversed in part and affirmed in part the dismissal of investors' securities fraud class action alleging violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10-b in connection with a restatement of financial results of the company in which the investors had purchased stock.

The panel held that the third amended complaint adequately pleaded the § 10(b), § 20A and Rule 10-b claims. Considering the allegations of scienter holistically, as the Supreme Court directed in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), the panel concluded that the inference that the defendant company and its chief executive officer and former chief financial officer were deliberately reckless as to the truth of their financial reports and related public statements following a merger was at least as compelling as any opposing inference.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court properly dismissed the § 20(a) "control person" claims.

## COUNSEL

Sanford Svetcov (argued), Susan K. Alexander, Christopher P. Seefer, Robbins Geller Rudman & Dowd LLP, San Francisco, California; Patrick J. Coughlin, Robbins Geller Rudman & Dowd LLP, San Diego, California, for Plaintiffs-Appellants.

Brendan P. Cullen (argued), Sverker K. Hogberg, Achyut J. Phadke, Sullivan & Cromwell LLP, Palo Alto, California; Robert A. Sacks, Sullivan & Cromwell LLP, Los Angeles, California, for Defendants-Appellees VeriFone Systems, Inc. and Douglas Bergeron.

Jordan Eth (argued), D. Anthony Rodriguez, Morrison & Foerster LLP, San Francisco, California, for Defendant-Appellee Barry Zwarenstein.

## OPINION

McKEOWN, Circuit Judge:

This case invokes the old adage that the sum is greater than the parts. National Elevator Industry Pension Fund ("National Elevator"), lead plaintiff on behalf of investors who purchased VeriFone Holdings, Inc. ("VeriFone") stock between August 31, 2006 and April 1, 2008, appeals the dismissal of its securities fraud class action. National Elevator alleged that VeriFone, Douglas Bergeron (the

company's Chief Executive Officer and former Chairman of the Board of Directors), and Barry Zwarenstein (the company's former Chief Financial Officer and Executive Vice President), violated §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10-b in connection with a December 2007 restatement of financial results.[1]

In three consecutive quarters, VeriFone's preliminary internal reports accurately showed it had fallen short of its earnings and gross margins projections. Three consecutive times, VeriFone's CEO and CFO supervised accounting staff as they made baseless multimillion-dollar adjustments that brought reported results in line with expectations. Each time, the CEO and CFO accepted the adjustments without question, representing publicly that a recent merger was driving the company's success even as the adjustments grew in size and negatively impacted key metrics. National Elevator characterizes the conduct as either intentionally directing a subordinate to make false adjustments or being deliberately reckless in failing to question and account for unsupported entries. In contrast, VeriFone paints itself as the victim of a difficult acquisition complicated by incompatible systems.

---

[1] National Elevator initially appealed the district court's order with respect to William Atkinson (VeriFone's former Executive Vice President of Global Marketing and Business Development), Craig Bondy (a former VeriFone director), and Paul Periolat (VeriFone's former supply chain controller). It has since voluntarily dismissed its appeal as to these defendants.

The district court dismissed National Elevator's Third Amended Complaint for failure to sufficiently allege scienter as to each of the defendants. Viewed in isolation, any one allegation may not compel an inference of scienter. However, when we consider the allegations holistically, as the Supreme Court directed in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), the inference that Bergeron, Zwarenstein, and VeriFone were deliberately reckless as to the truth of their financial reports and related public statements is "at least as compelling as any opposing inference." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). We reverse in part and affirm in part. National Elevator adequately pleaded its § 10(b), § 20A and Rule 10-b claims. It did not sufficiently plead its § 20(a) claims, which the district court properly dismissed.

## I. BACKGROUND

VeriFone, based in San Jose, California, engages in the design, marketing and service of transaction automation systems, including point-of-sale devices that enable secure electronic payments among consumers, merchants, and financial institutions. Its main customers include global financial institutions, payment processors, large retailers, government organizations, and healthcare companies. In November 2006, VeriFone acquired Lipman Electronic Engineering Ltd. ("Lipman"), an Israel-based developer, manufacturer, and seller of electronic payment systems and software, and began integrating the two companies.

VeriFone touted the merger as likely to improve its financial condition, increasing its *pro forma* gross margin expectations from 41-44% to 42-47%. However, in the five

quarters prior to the merger, VeriFone's own gross margins had never exceeded 45.6%; Lipman's had just dropped to 41.9% after five years of declines and were skewed towards low-margin areas. National Elevator alleges that defendants were aware of these facts and knew that "their representations of increasing gross margins of up to 48% during the Class Period had no reasonable basis."

In the three quarters following the merger (the first three quarters of VeriFone's fiscal 2007, referred to as 1Q07, 2Q07, and 3Q07), VeriFone reported gross margins of 47.1%, 48.1%, and 48.2%, respectively, allowing the company to claim the merger was an immediate success. It is undisputed that these reports were false.

In each quarter, VeriFone's initial internal financial reports (known as "flash" reports) painted a different, accurate picture, in which VeriFone's gross margins were well short of its projections. National Elevator alleges that Bergeron and Zwarenstein characterized these results as an "unmitigated disaster" and directed company management to "figure . . . it out" and "fix the problem." The "fixes" focused on accounting decisions, not operations. Zwarenstein and Bergeron gave VeriFone's supply chain controller, Paul Periolat, analyses of the shortfalls and suggested accounting adjustments, but their figures apparently had no basis other than VeriFone's desire to meet market expectations. Nonetheless, Periolat made the adjustments, enabling VeriFone to report results in line with its projections.

National Elevator alleges that these "manipulations were deliberate and pervasive and done for the specific purpose of meeting public guidance" and were made possible by VeriFone's lack of appropriate internal controls. In March

2007, VeriFone auditors Ernst & Young ("E&Y") raised concerns about inventory controls, requesting that VeriFone add "further measures" to address inaccuracies in inventory counts and other deficiencies. VeriFone told E&Y it was addressing the issues, but, as it turns out, any remedial measures did not prevent financial misstatements. Instead, the company continued to double-count and *inflate* inventory even though Bergeron, who received internal reports showing "a sharp and unprecedented increase in inventory as a result of [Periolat's] adjustments" had earlier stated that *reducing* inventory was as "important as any goal we've set in the past."

In accordance with accepted standards, E&Y did not audit VeriFone's quarterly reports during fiscal year 2007, relying instead on the accuracy of information from Zwarenstein and Periolat. When E&Y did audit VeriFone's annual financials in November 2007 and Periolat "was unable to explain his adjustments," the accounting irregularities came to light.

On December 3, 2007, VeriFone announced that its consolidated financial statements for 1Q07, 2Q07, and 3Q07 should not be relied upon due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory. This restatement resulted in reductions to net revenue of approximately $7.7 million, $11.5 million, and $8.4 million in the respective quarters. Those revenue reductions, in turn, resulted in reductions to previously reported income: approximately $11.8 million (with a net loss of $602,000), $10.2 million, and $14.7 million. Cumulatively, operating income for the three quarters fell from $65.6 million to $28.6 million, reflecting an overstatement of 129%. Gross margins were accordingly reduced from 47.1%, 48.1%, and 48.2% to

41.4%, 42.3%, and 41.2%. National Elevator further alleges that VeriFone overstated earnings per share by 600%, 200%, and 418%.

On the day of the restatement, VeriFone shares dropped over 45%, falling from $48.03 to $26.03. The next day, the first of nine securities fraud class actions was filed in the district court. The cases were consolidated pursuant to the Private Securities Litigation Reform Act ("PSLRA"), with National Elevator designated as lead plaintiff.

National Elevator's First Amended Complaint, which was dismissed for failure to adequately plead scienter, advanced six allegations of fraud committed by Bergeron and Zwarenstein. In a Second Amended Complaint, VeriFone, Atkinson, Bondy, and Periolat were added as defendants. The Second Amended Complaint relied on a Securities and Exchange Commission complaint (the "SEC complaint") filed in September 2009. The SEC complaint charged VeriFone and Periolat with books and records violations. Before the district court ruled on VeriFone's motion to dismiss the Second Amended Complaint, National Elevator filed its Third Amended Complaint adding new allegations based on transcripts of SEC investigatory interviews with VeriFone executives and employees. For ease of reference, the complaint at issue in this appeal—the Third Amended Complaint—is simply referred to as the complaint.

The district court concluded that National Elevator's allegations failed to raise a strong inference of scienter with respect to any of the defendants and granted the motion to dismiss with prejudice. In reaching this conclusion, the district court grouped individual allegations by topic and discussed their sufficiency. After determining that the

allegations associated with each grouping were insufficient to establish scienter, the district court engaged in a one-paragraph holistic analysis, stating that "[t]here are many allegations in this case, but they fare no better when read in combination than when read independently." National Elevator appeals the dismissal with respect to Bergeron, Zwarenstein, and VeriFone.

## II. PLEADING REQUIREMENTS

In our *de novo* review of the district court's grant of the motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failure to allege fraud with particularity under Rule 9(b), we pay particular attention to the heightened pleading requirements for securities fraud cases. These requirements present no small hurdle for the securities fraud plaintiff. A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). The PSLRA mandates that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA further provides that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

To satisfy the requisite state of mind element, "a complaint must 'allege that the defendant[] made false or

misleading statements either intentionally or with deliberate recklessness.'" *Zucco*, 552 F.3d at 991 (citation omitted). Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *abrogated on other grounds by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

The falsity of VeriFone's financial reports is undisputed. The only issue on appeal is whether National Elevator's allegations were sufficient to create a strong inference of scienter.

## A. *TELLABS* AND SCIENTER

In *Tellabs*, the Supreme Court clarified the appropriate inquiry for determining whether a plaintiff's allegations are sufficient as to scienter, stating that "[t]he 'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter.'" *Tellabs, Inc.*, 551 U.S. at 321 (first alteration added). Under this analysis, a court must first accept all factual allegations in the complaint as true. *Id.* at 322. The court then must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference." *Id.* The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original); *see also New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 531 U.S. at 323. Thus, "[t]he strength of an inference cannot be decided in a vacuum" and "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. Under the proper analysis, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 324 (emphasis added).

Scienter can be established by intent, knowledge, or certain levels of recklessness. *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). We adopted the following standard in *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc):

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. . . . [T]he danger of misleading buyers must be actually known or so obvious that *any reasonable man would be legally bound as knowing*, and the omission must derive from something more egregious than even 'white heart/empty head' good faith.

(first alteration in original) (emphasis added) (citations omitted). Scienter requires either "deliberate recklessness" or "conscious recklessness"—a "form of intent rather than a greater degree of negligence." *Platform Wireless*, 617 F.3d at 1093. We have also clarified that "although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010).

## B. HOLISTIC ANALYSIS UNDER *MATRIXX*

In *Matrixx*, the Supreme Court reiterated that courts must "review 'all the allegations holistically'" when determining whether scienter has been sufficiently pled. *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 326). Other than this general directive, the Court did not prescribe a particular analysis that a court must undertake, nor did it purport to alter the scienter analysis previously articulated in *Tellabs*. *See id.* ("A complaint adequately pleads scienter under the PSLRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" (quoting *Tellabs*, 551 U.S. at 324)).

Prior to *Matrixx*, we adhered to a dual inquiry in which

> first, [the court] will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; [and] second, if no individual allegations are sufficient, [the court] will conduct a 'holistic' review of the same

allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Zucco*, 552 F.3d at 992. *Matrixx* on its face does not preclude this approach and we have consistently characterized this two-step or dual inquiry as following from the Court's directive in *Tellabs*. *See id.* In cases where an individual allegation meets the scienter pleading requirement, whether we employ a dual analysis is most likely surplusage because the individual and the holistic analyses yield the same conclusion. Also, as a practical matter, some grouping and discussion of individualized allegations may be appropriate during a holistic analysis.

Post-*Matrixx*, our cases have employed varied approaches—some discuss first the sufficiency of specific allegations and then conduct a holistic review, while others conduct only a holistic analysis. *Compare WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052–53 (9th Cir. 2011) (providing a brief summary of plaintiffs' allegations and defendants' arguments and concluding that, taken as a whole, plaintiffs' complaint sufficiently alleged fraudulent intent) *with New Mexico State*, 641 F.3d at 1095–1103 (examining first plaintiffs' specific allegations and then briefly surmising that the allegations were sufficient under a holistic analysis). Other circuits have also used both approaches. *See generally In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1343–47 (10th Cir. 2012) (assessing allegations holistically and then analyzing relevant individual allegations); *Saltz v. First Frontier, L.P.*, No. 11-265cv, 2012 WL 2096399, at *2–*3 (2d Cir. June 12, 2012) (analyzing allegations individually,

though noting *Tellabs's* requirement for collective consideration); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1302 (11th Cir. 2011) ("[V]iewing all of the Plaintiffs' allegations in concert, the Complaint contains no allegations from which we can infer that anyone in [the company]'s management knew or 'must have' known about the . . . fraud . . . ."); *Ashland, Inc. v. Oppenheimer & Co.,* 648 F.3d 461, 469–71 (6th Cir. 2011) (explaining that district court's factor-by-factor analysis was not proper but concluding on holistic basis that competing inferences were more compelling).

In cases where courts have undertaken a dual analysis, a brief statement that the court has also viewed the claims holistically has been sufficient to meet the demands of *Matrixx*. *See, e.g., New Mexico State*, 641 F.3d at 1102–03. Because the Court in *Matrixx* did not mandate a particular approach, a dual analysis remains permissible so long as it does not unduly focus on the weakness of individual allegations to the exclusion of the whole picture. The risk, of course, is that a piecemeal analysis will obscure a holistic view. *Cf. Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (holding that former method of reviewing each allegation before reviewing them holistically "risks losing the forest for the trees" and that such a method is unnecessarily inefficient). To avoid potential pitfalls that may arise from conducting a dual analysis, we approach this case through a holistic review of the allegations to determine whether they combine to create a strong inference of intentional conduct or deliberate recklessness. In doing so, however, we do not simply ignore the individual allegations and the inferences drawn from them.

The district court here did not err as a matter of law by first engaging in an individualized discussion of the complaint's allegations and then summarily concluding that "in combination" the allegations did not sufficiently allege scienter.  The court's error lies in its undue discounting of the claims and the conclusion that an inference of deliberate recklessness was not warranted.

## III.    EXCHANGE ACT SECTION 10(B) AND SEC RULE 10B-5 CLAIMS

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors." 15 U.S.C. § 78j(b). "SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 131 S. Ct. at 1317 (quoting 17 C.F.R. § 240.10b-5(b)).  The Rule also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a), (c).    National Elevator alleges that Zwarenstein, Bergeron, and, by extension, VeriFone violated each subsection of Rule 10b-5.

## A. SUMMARY OF ALLEGATIONS

The complaint pleads intentional or deliberately reckless conduct on the basis of a host of allegations. A summary of these allegations follows. Although our ultimate analysis is holistic, it would be folly to simply skirt the major allegations.

According to VeriFone executives, VeriFone's gross margin was one of the most important financial measures of the company's overall financial condition. "Defendants touted the Company's gross margin in every major earnings press release, conference call and SEC filing and acknowledged that they closely monitored gross margins." National Elevator alleges that Zwarenstein and Bergeron knew the merger would put downward pressure on margins, noting that they emailed each other expressing concern about their projections regarding post-merger gross margins. Nonetheless, defendants were determined to show the market that the Lipman merger was an immediate and unqualified success.

National Elevator further alleges that investors and analysts were troubled by VeriFone's increased projections, and VeriFone knew it had to deliver gross margins and earnings to convince investors that the Lipman merger was a success and would drive future growth. VeriFone thus had sufficient motive to manipulate its actual gross margin percentages.[2]

---

[2] National Elevator characterizes Zwarenstein and Bergeron's stock sales during the Class Period as evidence of their motive and support an inference of scienter. However, as the district court noted, these stock sales took place under preexisting trading plans and were not out of line

### 1.  Repeated Accounting Manipulations

Each of the three restated quarters followed the same pattern.  Just after quarter-end, internal flash reports showed VeriFone's gross margins at approximately 40–42 %, far off the company's projections and market expectations.  Although certain documents and testimony from VeriFone executives revealed that flash reports typically contained inaccuracies and required revision, prior preliminary reports had not reflected such a drastic difference from initial projections.

Bergeron and Zwarenstein viewed these results as "unacceptable" and oversaw the company's efforts to remedy the situation, providing accounting staff with dollar figures and particular adjustments that would bring results in line with projections.  Their efforts included near-constant monitoring of specific adjustments and their impact on earnings and margins.  Even though Zwarenstein and Bergeron knew in each quarter the adjustments were "unusually high" (in fact, inventory adjustments increased in magnitude each quarter), they "recklessly failed to question or demand supporting documentation" for them. Significantly, their communications did not reflect concern with operational issues that might have been driving margins down: their priority was the financial statements and publicly reported results.

---

with prior trading volume.  These trades do not by themselves support an inference of scienter. *Silicon Graphics,* 183 F.3d at 986.

### a. 1Q07

At the end of 1Q07, Bergeron and Zwarenstein received internal flash reports indicating that the actual gross margins were 42.8%, markedly lower than the 45–47% VeriFone had estimated for the quarter. At least with respect to 1Q07, the gap between the preliminary flash reports and the initial gross margin forecast "was one of the bigger ones, if not the biggest" gap VeriFone had ever seen. Zwarenstein emailed Periolat directly, saying that "it would be an unmitigated disaster if COGS [cost of goods sold] are truly what is in" the flash report. Bergeron sent an expletive-laden email to Zwarenstein that week saying, "We need to get to 36.5 cents [in earnings]. Figure it out." When Zwarenstein replied "Can I speak to you?" Bergeron responded "You should wait until I cool down, use the time to figure out how we get to 36.5 cents." Bergeron had a history of putting accounting staff under pressure: already that quarter he had advocated against a "more stringent revenue recognition policy," telling Zwarenstein that "if we need to be a bit aggressive" on accounting to hit VeriFone's revenue target, "do it."

Zwarenstein repeatedly emailed Periolat the week after the end of 1Q07, providing him with the specific dollar amounts necessary to hit targets: "we are still off by $10,784,000 versus the forecasting. Is there an error in there somewhere?"[3] However, the email traffic does not reflect a

---

[3] National Elevator's claims that Zwarenstein in these emails explicitly instructed Periolat to falsify the numbers misrepresent Merkl's testimony. Merkl instead testified as to her interpretation of a statement made by Zwarenstein to Periolat, admitting that she did not know what Zwarenstein intended. The district court was correct in not crediting National Elevator's characterization and selective quotation of Merkl's testimony.

search for errors. Instead, Periolat emailed VeriFone controller Merkl to say that "we have to put a $10 million plug into direct material," which according to Merkl meant that an unsupported $10 million entry was required for VeriFone to hit its goals. The next day, Zwarenstein circulated a revised flash report to Bergeron and others showing that VeriFone had met its projections, saying, "I needed to reduce COGS by 10.7 [million] to get to what I think is 36.6 cents," as Bergeron had insisted. Zwarenstein later concluded that even larger revisions were required to hit projections; those increases were incorporated into Periolat's adjustments. The adjustments were without basis and were reversed during the restatement.

National Elevator acknowledges that Zwarenstein communicated to VeriFone staff that the company's accounting had to comply with Generally Accepted Accounting Principles ("GAAP"), though it states without support that this directive was a "wink-wink cover." Merkl's testimony before the SEC also indicated that Zwarenstein would not have directed Periolat to falsify numbers and that the company was attempting to determine the true cause of the discrepancy. However genuine these instructions and inquiries were, Zwarenstein and Bergeron did not concern themselves with the accuracy of or basis for the manual accounting adjustments. During 1Q07, they received weekly reports on COGS and margins and specifically monitored how inventory costs impacted company financials. Bergeron had also committed to reducing inventory and making the company's supply chain a "profit center." Yet, when Periolat's adjustment increased inventory by millions of dollars, they neither objected nor inquired further, and in fact repeated this silence in the coming quarters even as inventory

manipulations grew in size. This complacency can be described only as willful at this stage of the pleadings.

### b. 2Q07

VeriFone's flash reports for 2Q07 showed a gross margin of 43.7% which, as with the prior quarter, was significantly lower than the 46–48% guidance provided to investors. Although they received reports during the quarter that margins would likely deteriorate, Bergeron and Zwarenstein rejected these initial reports and instructed accounting staff, including Periolat, to determine the source of the discrepancy. Zwarenstein worked directly with Periolat and personally reviewed Periolat's adjustments, even directing their timing. Periolat "fixed" the problem by preparing a journal entry that increased in-transit (shipped from Lipman to Verifone but not yet received) inventory by $10.6 million and decreased COGS by the same amount. There was no basis for this adjustment because "goods were never actually shipped between the international headquarters and the United States." After checking with a subordinate, Periolat gave his calculations to another subordinate to prepare a manual journal voucher that was used to make manual adjustments to VeriFone's corporate records. Periolat signed the vouchers as a "reviewer," despite the fact that he made the initial calculations.

National Elevator claims as to 2Q07 that Bergeron and Zwarenstein deliberately concealed these manipulations from investors. Specifically, when asked by analysts during a 2Q07 conference call if there were any "unusual" items that caused VeriFone to report such high gross margins, "Zwarenstein falsely replied, 'no, there was [sic] no unusual items.'" Whether he truly believed the company's results,

Zwarenstein at least knew at the time of the substantial accounting adjustments and that the company's inventory levels were unusual.

### c.  3Q07

The third quarter of 2007 proved no different.  After it appeared that business pressures might drive margins down, initial reports came in significantly lower than VeriFone's projections.  Zwarenstein realized that to meet the 48% gross margin target, VeriFone would need to reduce COGS by approximately $18 million, resulting in a corresponding increase in inventory, which would end up at approximately $150 million.  He had "never seen an inventory projection quite that high . . . ."  Zwarenstein and Periolat discussed specific adjustments over email, including an $11.3 million "true-up" of "receiving inventory" and a $5.5 million increase in "in transit" inventory, totaling $16.8 million.  National Elevator notes that Bergeron, who focused on inventory levels, admitted that VeriFone had been "less than perfect" in its ability to manage inventory levels.  Despite awareness of the inventory management problems, and that for the third straight quarter Periolat's adjustments had increased company inventories by millions, Zwarenstein and Bergeron accepted Periolat's manual adjustments without question or without conducting a separate review.  Again, Periolat's adjustments had no legitimate basis.

### 2.  THE SEC COMPLAINT

The SEC complaint incorporated into National Elevator's complaint focuses primarily on VeriFone and on Periolat, who National Elevator has dismissed from its appeal of the

district court's order.[4]   Although the complaint makes no direct allegation that anyone knew that Periolat's accounting adjustments were false at the time they were made, it alleges that there was no reasonable basis for any of Periolat's manual entries, which relied on "an unfounded assumption that goods were in transit between VeriFone's international headquarters and the United States."[5]   The SEC also alleges that for each of the three quarters, no one reviewed Periolat's work during the quarter closing process.   "Senior management was aware of his adjustments but never questioned them. . . . [Senior management] simply assumed the preliminary actual results were wrong when they differed from the forecasts."   In fact, according to the SEC, senior management never questioned the increases despite monthly reports showing a sharp and unprecedented increase in inventory as a result of Periolat's adjustments.

The errors did not come to light until the annual audit in November 2007, at which time Periolat concluded that his adjustments were wrong and reported the problem to senior management.   The SEC complaint suggests that because Bergeron and Zwarenstein did not ask about the basis for Periolat's manual adjustments, they were not actually aware that the adjustments were erroneous until November 2007.

---

[4] Though the complaint does not specifically name Bergeron and Zwarenstein, referring only to "senior management," their roles as CEO and CFO, respectively, would likely include them in the "senior management" reference.

[5] We draw no inference from the SEC's decision not to plead scienter or charge defendants with fraud.  The district court erred in concluding that "the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter."  At this stage, we accept National Elevator's allegations as true. *Tellabs*, 551 U.S. at 322.

The December 2007 press release announcing the need for a restatement followed shortly thereafter.

### 3. VERIFONE'S SARBANES-OXLEY CERTIFICATIONS

As part of VeriFone's Form 10-Q filings, Bergeron and Zwarenstein certified that, as CEO and CFO, they "'carried out an evaluation of the effectiveness of [VeriFone's] disclosure controls and procedures' and '[b]ased on that evaluation . . . concluded that [VeriFone's] disclosure controls and procedures were effective as of the end of the period covered by this report.'" In compliance with Sarbanes-Oxley, Bergeron and Zwarenstein also signed sworn certifications to each Form 10-Q indicating, among other things, that they (1) "'[d]isclosed' any change that has materially affected, or is 'reasonably likely to materially affect, [VeriFone's] internal control over financial reporting'" and (2) "'disclosed . . . [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [VeriFone's] ability to record, process, summarize and report financial information.'"

National Elevator alleges that the disarray caused by the Lipman integration and prior awareness of lost or missing inventory sufficiently evinces that Zwarenstein and Bergeron were aware of problems related to VeriFone's internal controls. Statements from two confidential witnesses suggest there were significant inventory problems at the facility where much if not all of the Lipman inventory was eventually transferred, although the timing of their employment does not directly coincide with the time at which the accounting adjustments were made.

National Elevator also references a March 19, 2007 letter from E&Y informing "VeriFone's Audit Committee and management regarding VeriFone's control deficiency by stating that entire pallets of inventory were missed, part numbers were wrong and incomplete boxes were being counted as full." (internal quotation marks omitted). According to the complaint, "E&Y then asked VeriFone to add further measures to validate the correctness of the counts performed, and the VeriFone Board represented to E&Y that it was enhancing its training materials and also taking additional steps to identify and remove the poor performers." (internal quotation marks omitted). The complaint acknowledges that VeriFone took certain remedial measures, but alleges that these measures were insufficient because they "did not have any material impact in preventing VeriFone's false financial reporting." The complaint further alleges that these inventory control deficiencies enabled Periolat to enter the incorrect manual adjustments that allowed VeriFone to hit its targets. National Elevator also notes that in 2008 disclosures and press communications issued *after* Bergeron and Zwarenstein certified the 2007 SEC filings, VeriFone admitted numerous material weaknesses in its internal control over financial reporting throughout 2007.

## B. SUFFICIENCY OF THE ALLEGATIONS

While the PSLRA "significantly altered pleading requirements in private securities fraud litigation," *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005), it did not impose an insurmountable standard. It may well be the case that, as the district court concluded, the complaint does not establish or create a strong inference that anyone at VeriFone, including Periolat, *actually knew* that the manual adjustments were improper. However, that was not the only permissible

inference.  Recklessly turning a "blind eye" to impropriety is equally culpable conduct under Rule 10b-5.

National Elevator's allegations, viewed holistically, give rise to a strong inference that Bergeron, Zwarenstein and VeriFone were deliberately reckless to the truth or falsity of their statements regarding VeriFone's financial results, particularly gross margin percentages.  This inference is cogent and equally as compelling as the competing inference that VeriFone "was simply overwhelmed with integrating a large new division into its existing business."  *Zucco*, 552 F.3d at 1007.  The difficulty of the Lipman integration combined with general downward pressure on gross margins makes Zwarenstein and Bergeron's claims that they innocently relied on the company's optimistic models and projections implausible at best.  *See Frank v. Dana Corp.*, 646 F.3d 954, 961–62 (6th Cir. 2011) (finding that it was "difficult to grasp the thought" that the top two executives who reported "gangbuster earnings" "really had no idea" that their company was headed towards bankruptcy given their knowledge of operational problems and industry difficulties).  An inference of scienter is more compelling in light of Bergeron and Zwarenstein's public statements celebrating the merger as an unprecedented success, particularly those early statements touting the merged entity's supposed financial transparency.

In three consecutive quarters, Bergeron and Zwarenstein received accurate reports at quarter-end indicating that VeriFone had not met its financial targets. Each time, they addressed these "unacceptable" results by providing Periolat with accounting adjustments necessary to conform results to expectations.  Each time, Periolat entered those adjustments almost to the dollar.  Bergeron and Zwarenstein monitored

and checked on the adjustments, particularly their impact on margins and earnings. However, according to the allegations, a critical element was missing—they appear not to have asked Periolat whether the adjustments were based in fact or even why changes of that magnitude were necessary in the first place. *See Daou Systems,* 411 F.3d at 1023 (finding scienter where top executives directed improper recognition before projects were completed "without regard to any actual percentage of completion"). Their overriding concern was avoiding the "unmitigated disaster" of missing earnings targets, which led them to ignore unprecedented increases in inventory at the same time Bergeron was "obsessed" with reducing it and claimed publicly that VeriFone had achieved supply chain efficiencies.

The logical inference here—that VeriFone's priority was meeting projections even at the expense of accuracy—is not rebutted by the argument that it was entitled to rely on internal projections simply because they had been accurate in the past. It defies common sense that for three straight quarters following a merger, when preliminary reports came in substantially below expectations and the acquired company had lower margins, the correct "adjustments" to flash reports also happened to be the precise amounts Zwarenstein and Bergeron had identified as necessary to hit earnings targets. Yet Periolat's adjustments consistently matched the figures Zwarenstein and Bergeron gave him. In the face of repeated such adjustments, the company cannot simply close its eyes with a sigh of relief. *See Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (inferring scienter based on top executives' detail-oriented management style that would have made them "aware of the allegedly improper revenue recognition of such significant magnitude

that the company would have missed its quarterly earnings projection but for the adjustments").

VeriFone argues that this appeal is analogous to our decision in *Zucco*, a factually similar case in which we ultimately concluded that the plaintiffs failed to plead scienter. The plaintiffs in *Zucco* alleged that defendant Digimarc Corporation manipulated its accounting to deceptively bolster the company's financial condition, improperly capitalizing payroll costs and failing to recognize ordinary expenses. 552 F.3d at 988. The plaintiffs' allegations included

> (1) statements of six confidential witnesses, (2) Digimarc's April 5, 2005 restatement of earnings, (3) the resignations of [a defendant], two members of the accounting department, and the corporation's auditing firm during the class period, (4) statements made in filing the corporation's Sarbanes-Oxley certifications, (5) the compensation packages of the individual defendants, (6) the stock sales of the individual defendants occurring during the class period, and (7) a private placement by the corporation during the class period.

*Id.* at 992. We concluded that

> the facts alleged by Zucco point towards the conclusion that Digimarc was simply overwhelmed with integrating a large new division into its existing business. . . . This acquisition eventually mandated the integration of several accounting systems . . . .

> It is more plausible that Digimarc's management was unable to control the accounting processes within the corporation during this integration than that it was systematically using accounting manipulations to make the company seem slightly more financially successful.

*Id.* at 1007.    Similar to Digimarc, VeriFone faced complications integrating two distinct accounting systems, as well as two different methods for calculating inventory. But the similarity between these two cases does not swallow the critical differences.

Importantly, the complaint alleges in detail that Bergeron and Zwarenstein were hands-on managers with respect to operational details and financial statements, and that they would have been aware of the complications associated with the Lipman merger. *See Daou Systems,* 411 F.3d at 1022 (management's hands-on style, including monitoring of relevant databases, weighed in favor of scienter). At the very least, both executives were on notice that there might be issues with either VeriFone's forecasts model or the process of integrating Lipman. VeriFone disclosed neither concern to investors. To the contrary, Bergeron reassured investors and analysts of the success of the Lipman integration and provided concrete (though apparently baseless) explanations for the unprecedented increases in VeriFone's gross margins. The invocation of those previously undisclosed merger complications in their defense rings hollow.

National Elevator also advanced detailed allegations that Bergeron and Zwarenstein reviewed the internal flash reports, which included worksheets tracking changes on a day-to-day

basis. *Cf. South Ferry*, 542 F.3d at 784 (holding that a complaint relying on allegations that management had an important role in the company but lacking additional detailed allegations about the defendants' actual exposure to information falls short of the PSLRA); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."); *but see Zucco*, 552 F.3d at 1000 (holding that allegations that senior management closely reviewed accounting numbers and that top executives had several meetings to discuss quarterly inventory numbers did not support the inference that management was in a position to know that such data was being manipulated).

Although VeriFone, Bergeron, and Zwarenstein attack individual allegations in isolation, they cannot overcome the overwhelming inference drawn from a holistic view. Upon receiving accurate reports that VeriFone's margins and earnings were short of projections, Bergeron and Zwarenstein repeatedly "remedied" the problem by directing baseless adjustments to the company's financial statements, failing to inquire further once projections were met at the same time they encouraged employees to engage in "aggressive" accounting to ensure VeriFone hit other financial targets.

To be sure, National Elevator's selective quotation and mischaracterization of the SEC transcripts detracts from some of the complaint's allegations. *See Tellabs*, 551 U.S. at 326 (stating that omissions and ambiguities count against inferring scienter). However, these misstatements and omissions do not significantly undercut the strength of the

inference of scienter. When compared to the inference that VeriFone was grossly negligent and overwhelmed during the Lipman integration, the inference that Bergeron, Zwarenstein, and by extension VeriFone, were deliberately reckless to the truth or falsity of the financial reports is equally compelling. Accordingly, we reverse the district court's dismissal of the complaint.

## IV.    SECTION 20A INSIDER TRADING CLAIMS

National Elevator also appeals the dismissal of its § 20A claims. Section 20A, in relevant part, states:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). To prevail on its claims for violations of § 20A, National Elevator must first sufficiently allege a violation of § 10(b) or Rule 10b-5. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002). The district court dismissed National Elevator's § 20A claims on the basis that National Elevator failed to sufficiently plead scienter, thus failing to establish a § 10(b) or Rule 10b-5 violation. Because we reverse the district court's dismissal of the § 10(b) and Rule 10b-5 claims, we also reverse the court's dismissal of National Elevator's § 20A claims.

**V. SECTION 20(A) CONTROL PERSON CLAIMS**

Section 20(a) of the Exchange Act makes certain "controlling" individuals liable for violations of § 10(b) and its underlying regulations. *Zucco*, 552 F.3d at 990. In relevant part, § 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (citation omitted).

Dismissal of the § 20(a) claim was proper because there is no underlying claim against the "controlled" person, Periolat. The district court found that National Elevator failed to sufficiently plead scienter as to Periolat, which National Elevator does not challenge on appeal. Without establishing a securities violation by Periolat, National Elevator cannot sustain its § 20(a) control person liability claims. *See Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to

adequately plead a primary violation of section 10(b).”). Regardless of National Elevator's reasons for dismissing Periolat from its appeal, we are bound by the district court's determination that National Elevator failed to establish that Periolat violated § 10(b) or Rule 10-b.

## VI.    CONCLUSION

National Elevator adequately pleaded violations of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b as to VeriFone, Bergeron, and Zwarenstein. Its § 20A claim against Bergeron and Zwarenstein was sufficiently pled as well. National Elevator's § 20(a) claim was properly dismissed.

**AFFIRMED in part and REVERSED in part**. Costs on appeal shall be awarded to National Elevator.